**FILED**
**CLERK**

8/23/2012 12:07 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
MATTHEW GILLESPIE

                Plaintiff,

        -against-

MICHAEL J. ASTRUE, as
Commissioner of the United States Social
Security Adminsitration

              Defendant.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
09-CV-2198 (ADS)

<u>**APPEARANCES:**</u>

**Sherman, Federman, Sambur & Mcintyre, LLP**
*Attorneys for the Plaintiff*
8 East Main Street
Bay Shore, NY 11706
      By: Kenneth S. Beskin, Esq., Of Counsel

**Loretta E. Lynch**
United States Attorney
Eastern District of New York
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor.
Central Islip, New York 11722
      By: Vincent Lipari, Assistant United States Attorney

**SPATT, District Judge**.

      Matthew Gillespie ("Gillespie" or "the Plaintiff") commenced this action pursuant to the

Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging a final determination by

Michael J. Astrue, the Commissioner of Social Security ("the Commissioner") that he was

ineligible for Social Security disability benefits. Presently before the Court is the Defendant's

unopposed motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure

("Fed. R. Civ. P.") 12(c). For the reasons set forth below, the Commissioner's motion for

judgment on the pleadings is granted.

# I. BACKGROUND

## A. Procedural History

On April 20, 2005, Gillespie filed an application for Social Security disability benefits, alleging a disability and inability to work since May 15, 2004, due to the impairment of his neck, back, right arm, and right hand. (Administrative Transcript ("Tr.") at 282.) On July 15, 2005, the Social Security Administration ("SSA") denied his application and Gillespie made a timely request on August 1, 2005 for a hearing before an Administrative Law Judge ("ALJ")". (Tr. at 41.)

On July 5, 2007, a hearing was held before ALJ Seymour Rayner (the "ALJ"). (Tr. at 256.) Following the hearing, in a decision dated August 2, 2007, ALJ Rayner denied Gillespie's claim for disability benefits. (Tr. at 38.) Gillespie sought review of the ALJ's decision by the Appeals Council. (Tr. at 49.) On December 21, 2007, the Appeals Council remanded the case back to the ALJ because ALJ Rayner had erroneously considered December 31, 2005 as the date the Plaintiff was last insured for disability benefits, instead of the correct date of December 31, 2006. (Tr. at 57.) The Appeals Council also ordered the ALJ to give further consideration to the "treating and examining source opinion" and "nonexamining source opinion"; the Plaintiff's subjective complaints; and the Plaintiff's maximum residual functional capacity. In addition, the Appeals Counsel instructed the ALJ to provide more rationale in support of his evaluations. (Tr. at 57–58.) Also, the ALJ was to enlist the help of a vocational expert to ascertain appropriate jobs for the Plaintiff and these jobs' availability in the national economy. (Tr. at 58.)

On August 5, 2008, a subsequent hearing was held before ALJ Rayner. (Tr. at 8.) On September 4, 2008, ALJ Rayner again issued a decision denying Gillespie's claim for disability, finding him not disabled. (Tr. at 19.) On March 26, 2009, the Appeals Council denied the

Plaintiff's request for review of the ALJ's decision, thus making ALJ Rayner's decision dated September 4, 2008, the final decision of the Commissioner. (Tr. at 2.) On or about May 27, 2009, Gillespie commenced the present appeal from that decision.

## B. The Administrative Record

### 1. The Plaintiff's Background and Testimony

Gillespie was born on April 16, 1962, and was 43 years old at the time he filed his claim for disability benefits. (Tr. at 259.) He has a high school diploma and was working as a painter/foreman for Long Island Wallpaper when he sustained the injury that forms the basis of his claim. (Tr. at 282–83.) His employment required him to supervise a crew, lift heavy objects, and do manual labor, such as painting and sanding. (Tr. at 283.) His supervisory duties included giving employees assignments and assuring that the workers had the proper materials at the work site. (Id.)

According to Gillespie's testimony before the ALJ, on or about May 14, 2004, he injured his back, neck, right arm and right hand in a workplace injury while carrying a forty foot extension ladder. (Tr. at 263.) Gillespie is right hand dominant. (Tr. at 286.) He claims that he damaged a nerve in his right arm and suffered two herniated discs in his back. (Tr. at 282.)

On or about May 18, 2004, three days after the Plaintiff's workplace injury, he sought medical treatment from Mather Memorial Hospital. (Tr. at 14.) A physical examination revealed that Gillespie was suffering from a muscle spasm and that the range of motion in his back had decreased. (Tr. at 15.) X-rays of his "cervical spine revealed discogenic disease and degenerative arthritic changes of the lower cervical spine as well as some loss of the normal curvature. He was diagnosed with acute cervical and dorsal myofascial strain." (Id.) At no time since the date of the Plaintiff's injury has he been employed. (Tr. at 259.)

The Plaintiff contends that following the injury, he suffered pain emanating from his right shoulder blade to his right hand due to the herniated discs in his back. (Tr. at 285.) Gillespie testified at the relevant underlying hearing that he is incapable of fully extending his fingers on his right hand and that his motor skills and strength in his right hand have weakened due to the nerve entrapment in that hand. (Tr. at 286.)

In October 2006, Gillespie underwent carpel tunnel surgery. However, he testified that "[i[f anything it made it worse." (Tr. at 287.) Gillespie stopped pursing rehabilitation for the carpel tunnel after being told by doctors that the nerve was dead and would require exploratory surgery to fix. (Id.) Gillespie stated that he can sit for thirty minutes before needing to stand up. (Tr. at 298.) Once he stands, Gillespie claims that he is able to stand for about thirty minutes and can walk three to four blocks. (Tr. at 290.) The Plaintiff also stated that he has difficulty with repetitive motions with his right hand and can only lift about five pounds with his right hand. (Id.) The Plaintiff testified that he receives workers' compensation benefits. (Tr. at 295, 298. )

### 2. Relevant Medical Evidence

#### a. Paul Levin, M.D.-

On May 20, 2004, Dr. Levin began treating the Plaintiff for complaints "of right scapular and right index finger pain with right-hand weakness." (Tr. at 15.) Dr. Levin's examination revealed that Gillespie had a full range of motion in his neck, but suffered from mild tightness around the trapezial area. (Tr. at 213.) Gillespie's shoulders had a full range of motion, but had pain on elevation. (Id.) The Plaintiff had difficulty flexing his fingers on his right hand when that wrist was extended, and had decreased sensation around his right index finger. (Id.) Dr. Levin's initial impression was cervical radiculopathy, and this was supported by further

examinations. (Tr. at 211–13.) Dr. Levin found the Plaintiff unable to return to work. (Tr. at 213.)

On a May 27, 2004 examination by Dr. Levin, testing revealed that Gillespie had tingling in his hand and fifth finger. (Tr. at 212.) Gillespie continued to suffer from tenodesis of the fingers. (Id.) The Plaintiff was prescribed Vicodin for the pain. (Id.) On June 3, 2004, Dr Levin found decreased sensation in the hand and around the fourth and fifth fingers, but manual motor testing of the upper extremity and tinel testing of the elbow were both negative. (Tr. at 211.) Dr. Levin advised the Plaintiff to receive a magnetic resonance imaging (MRI) on his cervical spine, which revealed "multilevel herniations and/or osteophytes throughout the cervical spine." (Tr. at 175.) On June 10, 2004, Dr. Levin referred the Plaintiff to Dr. Golpariani for pain management and Dr. Gutman for a spine surgical consultation. (Tr. at 210.)

### b. Frederick Gutman, M.D.-Neurologist

On June 22, 2004, Dr. Gutman examined the Plaintiff for complaints of right-sided neck and shoulder pain radiating down his right arm, numbness in the fourth and fifth fingers of his right hand, difficulty extending his fingers, and moderate lower back pain. (Tr. at 149.) At that time, the Plaintiff said that the pain had improved, and he had switched from Vicodin to Tylenol. (Id.) A physical examination revealed "mild weakness of finger extension on the right and very mild weakness of wrist extension on the right." (Id.) Dr. Gutman noted that Gillespie's wrist flexion, confrontational motor exam, and bilateral grip were normal. (Id.) The range of motion in Gillespie's neck was nearly normal, and the deep tendon reflexes at his wrists and elbows bilaterally were present. (Id.) Dr. Gutman diagnosed Gillespie with "a cervical pain syndrome including his right shoulder and arm with a distribution most mimicking C7-8." (Id.) Although Gillespie had discogenic changes and a small disc herniation, Dr. Gutman did not see

compression in the neural canal and did not think surgery was necessary.  (Id.)  Dr. Gutman referred Gillespie for physical therapy.  (Id.)

### c.  Mehran Golpariani, M.D.-

Dr. Golpariani was referred to the Plaintiff for purposes of pain management by Dr. Levin.  At the hearing in front of the ALJ, it was established that Dr. Golpariani injected the Plaintiff with cervical epidural steroids on July 1, and July 22, 2004.  (Tr. at 215–16, 220–21.)

### d.  Patrict Poole, M.D.-Neurologist

On August 24, 2004, Dr. Poole examined Gillespie at the request of Dr. Gutman and noted that while Gillespie's neck had considerably improved, his right hand had weakened.  (Tr. at 138.)  The examination also revealed that Gillespie "had full muscle strength, tone and coordination in all muscle groups of the upper and lower extremities with the exception of the right hand where marked wasting was noted of all the intrinsic muscles of the right hand."  (Id.)  Tinel tests on Gillespie's right wrist and left elbow were positive, but negative at his right elbow.  (Id.)  Dr. Poole's impression was that the Plaintiff was suffering from posterior interosseous nerve entrapment on the right.  (Tr. at 139.)

On September 3, 2004, the Plaintiff underwent an electromyography ("EMG") and nerve conduction velocity ("NCV") study.  (Tr. at 140.)  The results were "consistent with a denervation of the deep radial nerve musculature on the right."  (Tr. at 140A.)  The results also indicated "bilateral entrapments of the median nerves in the carpal tunnels" and "evidence of entrapment of the ulnar motor nerves at the level of the elbow bilaterally."  (Id.)

On September 10, 2004, Dr. Poole revised his earlier impression and found that tests were more indicative of radial nerve palsy, bilateral carpal tunnel syndromes, and bilateral ulnar nerve entrapments.  (Tr. at 141.)  On October 21, 2004, Dr, Poole noted that the Plaintiff's radial

nerve distribution was strengthening, but that ulnar nerves and carpal tunnel problems persisted. (Tr. at 137.)  On workers' compensation forms from August 24, 2004 to October 21, 2004, Dr. Poole checked off boxes indicating that the Plaintiff was totally disabled from regular duties or work.  (Tr. 144–48.)  A June 12, 2006, an EMG/NCV report by Dr. Poole indicated an entrapment of median nerves and both wrists.  (Tr. at 187–88.)

In an April 23, 2007 examination, Dr. Poole noted that Gillespie could extend his fingers when his right wrist was in its normal position, but when the wrist was extended, the Plaintiff could not extend his fingers.  (Tr. at 243.)  An EMG test performed on May 3, 2007 on the right upper extremity was normal.  (Tr. 240–41.)

In July 2008, Dr. Poole stated on workers' compensation forms that the Plaintiff was partially disabled from performing regular duties or work.  (Tr. at 50, 251, 254.)  On a July 1, 2008 examination, the Plaintiff complained of hand weakness and Dr. Poole found a diminished range of motion in his neck.  (Tr. at 255.)  The Plaintiff had loss of strength of the extensor indicis proprius, the extensor digitorum communis, and the extensor digiti quinti proprius in the right upper extremity.  (Id.)  Dr. Poole's assessment was partial neuroetmesis of the right radial nerve in the spiral groove and that this was a permanent and severe partial injury.  (Id.)

On July 29, 2008, Dr. Poole noted that the results of an EMG did not support a radial nerve injury diagnosis, and that the results were consistent with damage to the medial cord of the brachial plexus.  (Tr. at 250.)  On the workers' compensation form for July 29, 2008, Dr. Poole stated that Gillespie was partially disabled.  (Id.)

### e.  Pradeep Albert, M.D.

On November 16, 2004, the Plaintiff underwent an MRI by Dr. Albert.  The results showed no evidence to suggest nerve entrapment syndrome or muscle atrophy.  (Tr. at 153.)  The

results did show common extensor tendinopathy and radial collateral ligamentous complex thickening.  (Id.)

### f.  Steven Sampson, M.D.-Hand Specialist

On behalf of Gillespie, Dr. Sampson examined him for the purpose of evaluating if he should be entitled to workers' compensation from December 10, 2004 to January 18, 2005. After assessing the ulnar nerve lesion and carpal tunnel syndrome, Dr. Sampson indicated on the worker's compensation forms that the Plaintiff was totally disabled from regular duties or work. (Tr. at 155–59.)

### g.  Jonathan R. Mallen, M.D.-Orthopedist

On March 14, 2005, the Plaintiff was examined by Dr. Mallen for complaints of pain radiating from his neck down to his right arm, and motor weakness in his right hand.  (Tr. at 161.)  The examination showed that the Plaintiff had no tenderness to palpation over the cervical spine or over the right and left-sided paraspinal muscles, that he had full rotation of his neck, and that he had full lateral bending of the neck.  (Id.)  Although Dr. Mallen found Gillespie to have full flexion/extension, he noted that Gillespie had stiffness with this motion.  (Id.)  Gillespie had full muscle strength in bilateral shoulder shrug, biceps, triceps, and distal wrist flexion/extension. (Tr. at 162.)  His symptoms were inconsistent with a diagnosis of posterior interosseous nerve deficiency.  (Id.)  Gillespie had good motor strength with the anterior interosseous nerve and ulnar nerve in his right hand.  (Id.)  While he had normal sensation in the median and radial nerves in his right hand, he also had "diminished sensation in the ulnar nerve root distribution on the ulnar aspect of the fifth digit."  (Id.)

After reviewing the Plaintiff's previous MRI and EMG results, Dr. Mallen diagnosed the Plaintiff with "[m]ultiple level disk herniation and foraminal encroachment and spinal stenosis

with symptoms of radiculopathy into the right upper extremity." (Id.) He also expressed concern that the Plaintiff may be suffering from cervical pathology, and not nerve entrapment. (Id.) Dr. Mallen referred the Plaintiff to be evaluated by Dr. Shapiro. (Id.) Dr. Mallen also completed a workers' compensation form indicating that the Plaintiff was totally disabled from regular duties or work. (Tr. at 163.)

### h. Michael Shapiro, M.D.-Orthopedic Spine Specialist

On April 28, 2005, Dr. Shapiro evaluated Gillespie for complaints of neck and right arm pain, along with difficulty in the extension of his fingers on his right hand. (Tr. at 185.) The examination revealed that Gillespie had dysrhythmia and pain on the cervical spine. (Id.) Dr. Shapiro found that the weakness into the extensors and intrinsics of Gillespie's right hand were consistent with posterior interosseous nerve entrapment. The Plaintiff's sensations and reflexes were intact, equal and symmetrical. (Id.) Dr. Shapiro diagnosed the Plaintiff with cervicalgia, a cervical sprain, up and down stenosis and posterior interosseous nerve entrapment. (Tr. at 186.) He recommended that the Plaintiff continue with conservative measures, home exercise and physical and occupational therapy, and noted that the motor function in his hand had improved on its own. (Id.) On June 16, 2005, Dr. Shapiro met with Gillespie again and an examination showed that he had positive Tinel's at the cubital carpal tunnel. (Tr. at 183.) Dr. Shapiro referred Gillespie to Dr. Rho for an evaluation of the cubital carpal tunnel. (Tr. at 184.)

In a follow-up examination on March 9, 2006, the Plaintiff reported difficulties with his neck and back, but found physical therapy to be helpful. (Tr. at 176.) A cervical spine examination revealed dysrhythmia, a spasm, as well as pain about the cervical spine and into the right medial scapular on palpation. (Id.) The Plaintiff's motor power was full in all distributions and deep tendon reflexes were intact. (Id.) Dysrhythmia, pain and spasms were also present in

the thoracic and lumbar spines. The thoracic spine had no detectable sensory level, and the lumbar spine had a decreased range of motion, tenderness to palpation and percussion, but had full motor power in all distributions, sensation intact to light touch and pinprick, and 2+ deep tendon reflexes. (Id.) Dr. Shapiro's impression was cervicalgia, cervical sprain, cervical spasm, thoracic pain, lumbago, and a lumbar herniated nucleus pulposus. (Tr. at 177.) Dr. Shapiro and the Plaintiff agreed to continue with conservative care, home exercise and physical therapy. (Id.)

### i. Mohammed Asif Iqbal, M.D.-Consultative Examiner

On June 14, 2005, Dr. Iqbal examined the Plaintiff on behalf of the SSA. (Tr. at 16.) Gillespie complained of neck, back, shoulder and right arm pain, and difficulty extending his fingers on his right hand when his wrist was extended. (Tr. at 164.) Gillespie reported that his back pain was worsened by prolonged sitting and prolonged standing. (Id.) Dr. Iqbal noted that Gillespie did not need any help getting on or off of the examination table. (Tr. at 165.) The Plaintiff had a right hand grip strength of 4+/5, and had no limitation "buttoning a button, zipping a zipper, or tying his shoelaces." (Id.) The Plaintiff did have a mild limitation to repetitive movements with his right hand. (Id.) The Plaintiff's cervical spine had full flexion, extension, lateral flexion bilaterally, rotary movements bilaterally, and had no cervical or paracervical pain. (Id.) The Plaintiff exhibited full range of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally, and full strength in his proximal and distal muscles. (Tr. at 166.) The Plaintiff's right hand ulnar side did have diminished sensation and had a limitation to extending all of his fingers when the right wrist was extended. (Id.) Dr. Iqbal believed that the Plaintiff did not have limitations to sitting or standing, nor walking short or long distances. (Tr. at 167.) He cautioned that the Plaintiff must be evaluated by an orthopedist if his upper or lower extremities' reflexes weaken, and that he should be further evaluated by an orthopedist and

neurologist because of the tingling sensation in the ulnar side of his right hand and limitation in extending his fingers when his right wrist was extended to determine whether any nerve pathology of the right upper extremity existed.  (Id.)

### j.   Walter Rho, M.D.-Orthopedist

On June 20, 2005, Dr. Rho evaluated Gillespie for complaints of neck pain, tingling in his right hand, and numbness in his fourth and fifth fingers of his right hand.  (Tr. at 182.)  On examination, Dr. Rho found that Gillespie had positive Tinel and elbow hyperflexion tests at his right elbow, resulting in ulnar paresthesias.  (Id.)  The right elbow radial tunnel had marked tenderness, and an increased tenderness to resisted forearm supination and third finger extension. (Id.)  He also had positive Tinel and Phalen tests at the right wrist, along with weakness of digital extension with the wrist in neutral.  (Id.)  Dr. Rho's initial impression was right radial tunnel syndrome, cubital tunnel syndrome, and carpal tunnel syndrome.  (Id.)  He recommended the following surgical proceedings for the Plaintiff: right radial tunnel release, ulnar nerve transposition, and carpal tunnel release.  (Id.)

### k.   Yan Sun, M.D.-Orthopedist

On July 12, 2006, Dr. Sun examined the Plaintiff for complaints of numbness, tingling, and pain in his right hand.  (Tr. at 204.)  Dr. Sun's impression was right wrist carpal tunnel syndrome, and the Plaintiff agreed to surgical treatment.  (Tr. at 207.)  On October 3, 2006, Dr. Sun performed right wrist carpal tunnel release on the Plaintiff.  (Tr. at 208).  Follow-up appointments with Dr. Sun from October 11, 2006 to January 17, 2007 indicate that Gillespie had stiffness in his right hand.  (Tr. at 196–202.)  An examination on April 11, 2007 revealed positive atrophy of the thenar muscle and stiffness of the fingers in Gillespie's right hand.  (Tr. at 223.)

### l.   Todd Goldman, D.C.-Chiropractor

Chiropractor Goldman treated Gillespie for cervical radiculitis/neuritis and cervical dysfunction in October, November, and December of 2006; January of 2007; and May and June of 2008.  (Tr. at 189–95, 244–47.)  On the workers' compensation forms, Chiropractor Goldman stated that Gillespie was totally disabled from regular duties or work.  (Id.)

Notably, the ALJ gave no weight to the assessment of disability by Dr. Goldman, who was not considered to be an acceptable medical source whose opinion would be controlling.

### m.  Barry Rubin, M.D.-Rehabilitation Specialist

Finally, on February 7, 2007, Dr. Rubin evaluated and treated the Plaintiff for pain of his cervical spine.  (Tr. at 233.)  On examination, Dr. Rubin found the Plaintiff to have mild reductions in the strength of his fingers, thumb abduction, and grasp strength of his right hand. (Tr.at  234.)  The examination showed altered sensation involving the right C6 dermatome distribution and decreased sensation of the ulnar nerve distribution, but a Tinel test at the wrists bilaterally was negative.  (Id.)  The Plaintiff had a limited range of motion in his cervical spine, and cervical spine and right trapezius pain.  (Id.)  Spasms were also found on palpation involving the bilateral trapezii and bilateral cervical paraspinal musculature.  (Id.)  The right hand had a mild flattening of the thenar and hypothenar regions, but a Froments Test was negative.  (Id.) Dr. Rubin diagnosed the Plaintiff with cervical herniated disc C6/C7, cervical radiculopathy, cervical myofascial pain, status post right carpal tunnel syndrome release, and possibly "Radial Nerve Palsy Right Upper Extremity".  (Tr. at 235.)  Dr. Rubin recommended physical therapy three times a week for eight weeks.  (Id.)

### 3. Testimony of the Vocational Expert

At the July 5, 2007 hearing before the ALJ, Dr. David Vandegroot, a vocational expert who appeared on behalf of the SSA, testified that the Plaintiff's past work according to the U.S. Department of Labor's Dictionary of Occupational Titles (DOT) would be characterized as skilled and semi-skilled. (Tr. at 301.) As a result of this past work, Dr. Vandegroot testified that Gillespie acquired certain skills, including the ability to interpret work specifications such as blueprints; the ability to use a shop mat; and the ability to use hand and power tools. (Id.) Dr. Vandegroot agreed that a hypothetical person with the Plaintiff's injury would be unable to do Gillespie's previous work, but that there were possible jobs that would not require repetitive use of the dominant hand which the Plaintiff could perform. For example, Vandegroot testified that such an individual could perform the positions of appointment clerk or surveillance monitor. (Id.) However, Dr. Vandegroot acknowledged that there "would be a great deal of adjustment." (Tr. at 303.)

### C. **The ALJ's Findings**

On September 4, 2008, the ALJ issued his second and final decision. Specifically, he evaluated Gillespie's impairments, credibility and residual functional capacity through December 31, 2006, and not only through December 31, 2005, as he had in the previous determination.

The issue the ALJ confronted with was whether Gillespie was "disabled" under sections 216(j) and 223 of the Act. After considering all of the evidence, he concluded that the claimant was not under a disability within the meaning of the act from May 15, 2004 through the date last insured, which was December 31, 2006. In particular, he found that:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 15, 2004 through his date late insured of December 31, 2006 . . .

3. Through the date last insured, the claimant had the following severe impairments: neck and back pain, herniated disc, osteoarthritis and hand nerve pain . . .

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404 . . .

(Tr. at 13.)

Next, the ALJ found that "[a]fter careful consideration of the entire record, . . . through the date last insured, the claimant had the residual functional capacity to perform a wide range of light work as defined in 20 CFR 404.1567, in that he was able to sit for six hours in an eight-hour day, stand/walk for six hours in an eight-hour day and lift/carry up to 10 pounds. He is limited in the repetitive use of his hands." (Id.) In this vein, the ALJ determined that the Plaintiff was not credible as to the extent of his impairments, because his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the residual functional capacity assessment. The ALJ's decision states that the claimant testified he was able to perform a full range of daily activities, many of which require the use of both hands for gross and fine manipulations. After assessing the range of medical opinions, the ALJ found that the residual functional capacity was supported by the weight of the medical evidence of record, as well as the extensive testimony of Gillespie.

The ALJ went on to affirm that the "[t]hrough the date last insured, the claimant was unable to perform any past relevant work" as a painter, foreman, bowling alley mechanic, construction laborer or shipping/receiving clerk. (Tr. at 18.) The ALJ based this on the vocational expert's testimony that these jobs all required a medical level of exertion and repetitive use of his hand.

However, the ALJ also found that the claimant was 44 years old; had at least a high school education and was able to communicate in English; and had acquired work skills from past relevant work that were transferrable to other occupations with jobs existing in significant numbers in the national economy.  Based upon these findings, along with Gillespie's residual functional capacity, the ALJ determined that the Plaintiff was not under a disability as defined in the Act, at any time from May 15, 2004 through December 31, 2006.  (Tr. at 19.)

## II.    DISCUSSION

### A.  <u>Standards of Review</u>

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record.  <u>See</u> 42 U.S.C. § 405(g); <u>Janinski v. Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Brown v. Apfel</u>, 174 F.3d 59, 61–62 (2d Cir. 1999); <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999).  Substantial evidence is "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion."  <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record."  <u>See</u> <u>Clark v. Commissioner of Soc. Sec.</u>, 143 F.3d

115, 118 (2d Cir. 1998).  When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion."  Id.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).  Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record."  Clark, 143 F.3d at 118.  Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

**B.  Analytical Framework for Determining Disability**

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).  The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id.

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. See 20 C.F.R. §§ 404.1520, 416.920.

When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience.

In the present case, the Commissioner moved unopposed for affirmation of the denial of benefits. Although being provided with an opportunity to oppose the instant motion, the Plaintiff failed to do so. "Nevertheless, the court will view the facts most favorably to plaintiff, the non-moving party." Pinckney v. Astrue, No. 06 Civ. 6625, 2009 WL 750061, at *5 (E.D.N.Y. March 17, 2009).

C. **The ALJ Adhered to the Sequential Evaluation**

In this case, the ALJ adhered to the regulatory five-step sequential evaluation. First, the ALJ found that the Plaintiff met the special insured status requirements of the Act from May 15, 2004 through December 31, 2006, and that the Plaintiff had not engaged in substantial gainful activity since May 15, 2004. Second, the ALJ found that the medical evidence established that

on or prior to December 31, 2006, the Plaintiff had several impairments, including neck and back pain, a herniated disc, osteoarthritis, and hand nerve pain.

Third, the ALJ found that the Plaintiff's impairment or combination of impairments did not meet or equal in severity the clinical criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. Fourth, the ALJ evaluated the Plaintiff's residual functional capacity and found that on or prior to December 31, 2006, he remained capable of performing work that involved sitting up to six hours in an eight-hour workday; standing/walking up to two hours in an eight-hour workday; and lifting/carrying up to ten pounds occasionally. Consequently, the ALJ concluded that considering the Plaintiff's age, education, work experience, and residual functional capacity, he had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy and thus was not under a disability as defined under the Act. Accordingly, the ALJ applied the correct legal standard.

### D. **The ALJ's Findings are Supported by Substantial Evidence**

Next, the Court will assess whether the ALJ's findings were supported by substantial evidence. There must be "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion." Zabala v. Astrue, 595 F.3d 402, 408 (2d Cir. 2010) (internal quotation marks and citation omitted).

#### 1. **Gillespie's Residual Functional Capacity**

Residual functional capacity ("RFC") is the most that a person can do despite his or her limitations. 20 C.F.R. § 416.945(a)( 1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities

on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an

equivalent work schedule."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

When the ALJ makes an assessment as to RFC, he should consider a claimant's physical

abilities, mental abilities, symptomatology, including pain and other limitations that could

interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).  A

finding as to RFC will be upheld on review when there is substantial evidence in the record to

support the requirements listed in the regulations.

As noted above, the ALJ concluded that Gillespie retained the RFC to perform light work

as defined in 20 C.F.R. 404.1567:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the
> weight lifted may be very little, a job is in this category when it requires a good
> deal of walking or standing, or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, you must have the ability to do
> substantially all of these activities. If someone can do light work, we determine
> that he or she can also do sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.  The ALJ found that Gillespie could perform a wide range of light work,

in that he was able to sit for six hours in an eight-hour day; stand/walk for six hours in an eight-

hour day; and lift/carry up to ten pounds, although he was limited in the repetitive use of his

hands.

The ALJ partly based this decision upon the testimony of the consultative examiner, Dr.

Iqbal.  At the hearing, Dr. Iqbal found that the Plaintiff had no limitations as to sitting, standing,

or walking short and long distances.  He also found that Gillespie had normal gait and station,

had full rotation or his cervical spine, as well as full strength in his proximal and distal muscles.

He did find that Gillespie had "reducible limitation of joints during extended wrists condition

trying to extend all fingers." (Tr. at 166.) However, Dr. Iqbal found that there was no joint instability or muscle atrophy, no abnormalities in the thoracic or lumbar spine or in the lower extremities, and that Gillespie had full motion of his shoulders, elbows, forearms, writs, and fingers bilaterally. According to Dr. Iqbal, the Plaintiff had 4+/5 grip strength in his right hand and had no limitation for buttoning a button, zipping a zipper or tying shoelaces.

Thus, the ALJ properly relied upon Dr. Iqbal's assessment in determining Gillespie's RFC. See Cichocki v. Astrue, No. 11 Civ. 755, 2012 WL 3096428, at *6 (W.D.N.Y. June 30, 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of consultative examiners, and such written reports can constitute substantial evidence."); Ghio v. Astrue, No. 10 Civ. 62, 2011 WL 923419, at *19 (D. Vt. March 1, 2011) ("The ALJ was entitled to rely on the consultative examiners' assessment, in light of the objective medical evidence and his credibility finding."). Cf. Moore v. AStrue, No. 07 Civ. 5207, 2009 WL 2581718, at *10 n.22 (E.D.N.Y. Aug. 21, 2009) ("As Plaintiff correctly notes, the ALJ cannot rely solely on those RFCs as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician."); Harris v. Astrue, No. 07 Civ. 4554, 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) ("The Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight'" (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990))).

Of importance, the consultative examiner's report was consistent with other evidence in the record, particularly clinical assessments. For example, Dr. Levin—the Plaintiff's treating physician— found that he had a full range of motion in his neck and shoulders. To be sure, Dr. Levin found that Gillespie had difficulty flexing certain fingers on his right hand when his wrist

was extended, as well as some decreased sensation in the fourth and fifth fingers. Nevertheless, manual motor testing of the upper extremity and tinel testing of elbow were both negative, and the RFC expressly included a finding that Gillespie could not perform a job that required repetitive use of his hand. As another example, Dr. Gutman—the Plaintiff's neurologist—noted that Gillespie's wrist flexion, confrontational motor exam, and bilateral grip were normal; that the range of motion in Gillespie's neck was nearly normal; and that although Gillespie had discogenic changes and a small disc herniation, Dr. Gutman did not see compression in the neural canal and did not think surgery was necessary. Again, an examination did reveal mild weakness of finger extension on the right hand. However, that does not render the ALJ's finding unsupported by substantial evidence, as the RFC was determined with this in consideration.

The Plaintiff's next treating physician, Dr. Poole, found marked wasting of the intrinsic muscles of the right hand, and EMG results indicated a "denervation of the deep radial nerve musculature on the right" as well as "bilateral entrapments of the median nerves in the carpal tunnels". (Tr. at 140.) He noted that Gillespie's carpal tunnel problems persisted, and eventually the results of an EMG were consistent with damage to the medial cord of the brachial plexus. On the other hand, Dr. Albert conducted an MRI and found no evidence to suggest nerve entrapment or muscle atrophy. Rather, the results showed common extensor tendinopathy and radial collateral ligamentous complex thickening.

In 2005, Gillespie began treatment with Dr. Mallen. His examination showed that Gillespie had full rotation of his neck and that he had full lateral bending of the neck, although there was stiffness with this motion. He also found that Gillespie had full muscle strength in bilateral shoulder shrug, biceps, triceps, and distal wrist flexion, extension, as well as good motor strength with the anterior interosseous nerve and ulnar nerve in his right hand. The Plaintiff next

saw Dr. Shapiro, who found weakness into the extensors and intrinsics of Gillespie's right hand. However, he found that Gillespie's sensations and reflexes were intact, equal, and symmetrical. He noted that the motor function in Gillespie's hand had improved on its own. Eventually, Dr. Shapiro found that the Plaintiff's motor power was full in all distributions and that his deep tendon reflexes were intact.

Certainly, many of the Plaintiff's treating physicians opined that he was disabled with regard to workers' compensation. However, those determinations are not dispositive, because the standards for workers' compensation are different than those under the Act. See Elias v. Apfel, 54 F. Supp. 2d 172, 180 (E.D.N.Y. 1999) (Spatt, J.) ("In fact, with reasonable certainty, Dr. Lehman's opinion was not really relevant on the issue of whether Elias was entitled to disability benefits, as it was submitted to a Workers' Compensation Board for the purpose of determining whether Elias could continue his present employment as a cab driver."); see also Rokitka v. Astrue, No. 10 Civ. 62, 2012 WL 2405197, at *3 (W.D.N.Y. June 25, 2012) ("disability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context"); Lefever v. Astrue, No. 07 Civ. 622, 2010 WL 3909487, at *13 (N.D.N.Y. Sept. 30, 2010). Therefore, "[a]lthough plaintiff's doctors had checked off that plaintiff was disabled on forms sent to the Workers' Compensation Board, the standards which regulate workers' compensation relief are different from the requirements which govern the award of disability insurance benefits under the Act. Accordingly, an opinion rendered for purposes of workers' compensation is not binding on the Secretary." Rosado v. Shalala, 868 F. Supp. 471, 473 (E.D.N.Y. 1994) (citing Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984)).

Ultimately, the determination of whether a claimant is disabled is "reserved to the Commissioner." 20 C.F.R. § 404.1527(e). Here, the Court finds that the ALJ's determination of RFC— specifically, that Gillespie could perform light work as long as there was a limitation for repetitive use of his hands—was supported by substantial evidence.

## E.  The ALJ's Assessment of Gillespie's Credibility

As part of the ALJ's final determination, he found that Gillespie's subjective complaints of his alleged disability were not completely credible.  Gillespie had complained that he was unable to lift heavy objects, sit or stand for long periods of time, or move in certain directions. (Tr. at 44.)  In addition, he contended that he was unable to open his right hand.  The ALJ found that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms.  However, ALJ Rayner also found that "the claimant is not credible as the extent of his impairments. . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . ." (Tr. at 14.)

"[A] claimant's subjective report of her symptoms is not controlling but must be supported by medical evidence."  Vilardi v. Astrue, 447 Fed App'x 271, 272 (2d Cir. 2012) (quoting 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529.)  If the pain is not substantiated by objective medical evidence, the ALJ engages in a credibility assessment.

> That credibility inquiry implicates seven factors to be considered, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. § 404.1529(c)(3)(i)-(vii).

Meadors v. Astrue, 370 Fed. App'x 179, 183 n.1 (2d Cir. 2010).

Here, even though the claimant testified regarding the extent of his impairments, he also testified that was he was able to bathe himself; comb his hair; shave; go to the barber; buckle; put on a coat; button; zip a zipper; tie a bow; shop; pull a shirt overhead; do laundry; make a bed; cook; open an envelope; take out the garbage; climb stairs; eat with a knife and fork; hold a cup of tea; and open doors. Therefore, based on this wide ranging account of the Plaintiff's daily activities, it was reasonable for the ALJ to discredit Gillespie's subjective claim of total disability from all types of work. See Lamorey v. Barnhart, 158 Fed App'x 361, 363 (2d Cir. 2006) ("As the district court observed, it is entirely appropriate for an ALJ to consider a claimant's daily activities in assessing her credibility and capacity to perform work-related activities.").

In addition, the Plaintiff testified that he occasionally uses Tylenol or Advil for pain relief. Gillespie testified that he discontinued taking any prescription medications because they made him vomit, but the ALJ noted that there was no indication that he had ever reported this to a doctor. Gillespie also testified that he stopped going to the doctor because there was no sense in doing so. Therefore, the Court finds that the ALJ properly "resolve[d] evidentiary conflicts and [appraised] the credibility of witnesses, including the claimant." Calabrese v. Astrue, 358 Fed. App'x 274, 277 (2d Cir. 2009) (internal citation omitted). See id. (affirming the ALJ's credibility assessment because it was amply supported by evidence that the plaintiff "(1) took no prescription strength pain medication despite her contention that she constantly experienced pain that was an 8 on a scale of 1 to 10; (2) was noncompliant in taking the medication that was prescribed by her doctors; and (3) admitted her ability to cook, clean, do laundry, shop, and handle her own finances despite her professed claims of disabling and continuous pain and mental confusion.").

Accordingly, the Court finds that the ALJ did not commit legal error and that there was substantial evidence in the record supporting his conclusion that Gillespie was still capable of performing light work as defined in 20 CFR 404.1567, and was therefore not disabled within the meaning of the Act.

### III.    CONCLUSION

The Court has reviewed the submission of the Defendant and the findings by the Commissioner and ALJ Rayner.  For the reasons set forth above, it is hereby ordered that Commissioner's motion for judgment on the pleadings is granted and the Plaintiff's complaint is dismissed.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**


Dated: Central Islip, New York
        August 23, 2012

                                           ____*/s/ Arthur D. Spatt*_____
                                              ARTHUR D. SPATT
                               United States District Judge